## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **DEIRA ROBERTSON**, on behalf of himself and all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **NATIONSTAR FINANCIAL, INC., D/B/A MR. COOPER AND MR. COOPER GROUP, INC.,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Deira Robertson ("Plaintiff" or "Plaintiff Robertson"), individually on and on behalf of all similarly situated persons, by and through her undersigned counsel, files this Class Action Complaint against Nationstar Financial, Inc., d/b/a Mr. Cooper ("Nationstar"), and Mr. Cooper Group Inc., (collectively "Defendants" or "Mr. Cooper")) and alleges the following based on personal knowledge of facts pertaining to him, on information and belief, and based on the investigation of counsel as to all other matters.

## NATURE OF THE ACTION

1.      Mr. Cooper is the largest non-bank mortgage servicer in the country, servicing mortgages valued at approximately $937 billion. As a mortgage servicer, Mr. Cooper is in possession of, and has the duty to protect, the personal identifiable information of millions of Americans.

2.      This class action arises out of a recent cyberattack and data breach ("Data Breach"), which resulted in unauthorized actors viewing and accessing the personally identifiable information ("PII") of a significant number of individuals whose loan were serviced by Mr. Cooper.

1

3.      On or around October 31, 2023, Mr. Cooper suffered a data breach in which an unauthorized third party obtained PII of some of its customers. The cyberattack caused Mr. Cooper to shutdown its technology systems preventing millions of borrowers from making payments on their loans between November 1, 2023, and November 4, 2023.[1]

4.      Mr. Cooper's carelessness, negligence, and lack of oversight and supervision caused its customers to lose all sense of privacy. Plaintiff and members of the Class have suffered irreparable harm, including the exposure of their PII to nefarious strangers and their significantly increased risk of identity theft. The information at issue here is the very kind of information that allows identity thieves to construct false identities and invade all aspects of Plaintiff's and Class members' lives. In addition to facing the emotional devastation of having such personal information fall into the wrong hands, Plaintiff and Class members must now undertake additional security measures and precautions to minimize their risk of identity theft.

5.      Plaintiff's and the Class members' rights were disregarded by Mr. Cooper's negligent or reckless failure to take adequate and reasonable measures to ensure its data systems were secure and the PII entrusted to it would not be stolen. Mr. Cooper also failed to disclose the material fact that it did not have adequate information security controls to safeguard PII, failed to take foreseeable steps to prevent the Data Breach, and failed to monitor and timely detect the Data Breach.

6.      As a result of the Data Breach, Plaintiff's and Class members' PII has been and will continue to be exposed to criminals for misuse.

7.      Plaintiff brings this action individually and on behalf of the Class, seeking remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs,

---

[1] Mr. Cooper Group Inc., Form 8-K/A (Nov. 8, 2023) https://d18rn0p25nwr6d.cloudfront.net/CIK-0000933136/4edccf79-a641-4e5a-bf8c-0d681457778c.pdf (last visited December 7, 2023).

injunctive relief, reasonable attorneys' fees and costs, and all other remedies this Court deems proper.

**PARTIES**

*Plaintiff*

8.      Plaintiff Robertson is, and at all times mentioned herein was, a citizen and resident of the state of Texas. Plaintiff Robertson's mortgage loan was serviced by Mr. Cooper at the time of the Data Breach.

9.      As Ms. Robertson's servicer, Mr. Cooper as in possession of her PII including but not limited to, her name, address, email address, phone number, Social Security number, date of birth and other confidential financial and credit information at the time of the Data Breach.

10.      In its privacy policy, Mr. Cooper represented to Plaintiff and Class members that it is committed to respecting Plaintiff and Class members' data privacy, and that "[k]eeping financial information is one of our most important responsibilities. Only those persons who need it to perform their job responsibilities are authorized to access your information. We take commercially reasonable precautions to protect your information and limit disclosure by maintaining physical, electronic and procedural safeguards."[2]

11.      Plaintiff and Class members did not initially choose to entrust their PII to Mr. Cooper, but instead their information was provided to Mr. Cooper because the servicing of their loan was transferred or sold to Mr. Cooper by the noteholder. Nevertheless, Plaintiff and Class members thereafter continued to supply Mr. Cooper with their PII because they understood from Mr. Cooper's representations, and duties as a mortgage servicer under the applicable law and regulations, that it would comply with its obligations to keep such information confidential and secure from unauthorized access, including thoroughly vetting all third parties it hired to ensured

---

[2] Privacy Policy, Mr. Cooper, https://www.mrcooper.com/privacy (last visited Dec. 7, 2023).

that they employed adequate data security measures, procedures, protocols, and practices.

12.    Because of the Data Breach, Plaintiff's PII is now in the hands of criminals. Plaintiff and all Class members are now imminently at risk of crippling future identity theft and fraud.

13.    In late October 2023, Plaintiff attempted to log on to Mr. Cooper's website to pay her monthly mortgage payment, but was unable to access the site, and make the payment on that date.

14.    On November 2, 2023, she received a "security update" email from Mr. Cooper that was titled "Notice of Cyber Security Incident" and that Mr. Cooper had been the target of a cyber attack on October 31, 2023.

15.    In the following days and weeks, Plaintiff received notices from two of her financial institutions though which she had dark web monitoring for her personal information, stating that her personal information had appeared on the dark web.

16.    After receiving the notice from Mr. Cooper as well as the dark web alerts, Plaintiff Robertson spent considerable time to take steps to mitigate the adverse consequences of the Data Breach, including reviewing account statements, monitoring credit reports, and changing passwords for *all* online accounts. The Notice of Cyber Security Incident directed Plaintiff Robertson to take these actions.[3]

17.    As a direct and proximate result of the Data Breach, Plaintiff will likely need to continue purchasing a lifetime subscription for identity theft protection and credit monitoring.

18.    Plaintiff has been careful to protect and monitor her identity. Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; and (b) damages to and diminution in value of Plaintiff's PII that was entrusted to

---

[3] Notice of Cyber Security Incident (Nov. 15, 2023) https://incident.mrcooperinfo.com (lasted visited Dec. 7, 2023).

Defendants with the legal obligation to protect it; and (c) continued risk to Plaintiff's PII, which remains in the possession of Mr. Cooper and which is subject to further breaches, so long as Mr. Cooper fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Mr. Cooper.

*Defendants*

19.     Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper is a Delaware limited liability company with its principal place of business in Coppell, Texas.

20.     Defendant Mr. Cooper Group Inc. is a for-profit Delaware corporation with its principal place of business in Coppell, Texas. The Mr. Cooper Group is the operating parent of its subsidiary Nationstar.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one member of the Class, defined below, is a citizen of a different state than Defendants, and there are more than 100 putative Class members.

22.     This Court has personal jurisdiction over Defendants because their principal place of business is in this District, they regularly transact business in this District, and upon information and belief, some Class members reside in this District.

23.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) because Defendants' principal place of business is located in this District and a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

*The Data Breach*

24.     On October 31, 2023, Mr. Cooper was the target of a cyberattack and data breach. In response, Mr. cooper claims that it "took immediate steps to lock down" its systems. This lock down prevented borrowers from being about to make payments or gain access to their account information for several days.[4]

25.     On November 2, 2023, Mr. Cooper filed a Form 8-K with the United States Security and Exchange Commission ("SEC") disclosing the cyberattack. Mr. Cooper did not state in this filing whether any unauthorize disclosure of customer information had occurred.[5] Mr. Cooper did state that it did not believe that the incident would have a material adverse effect on its business.

26.     On November 8, 2023, Mr. Cooper filed a supplemental report with the SEC, this time admitting that "customer data was exposed."[6] Mr. Cooper continued to maintain that its financial condition would not be materially impacted by the Data Breach; Plaintiff and the Class members are unlikely to be so lucky.

27.     On November 15, 2023, Mr. Cooper issued a Notice of Cybersecurity Incident on its website[7] and in emails to its customers. In the notice, Mr. Cooper stated that it believed that customer data was exposed and advised customers to monitor their financial accounts and credit reports for unauthorized activity. Mr. Cooper stated that it continued to investigate and would mail notices to the customer who had been affected and provide them with complimentary credit

---

[4] *See* Stacey Cowley, *Cyberattack Disrupts Mortgage Payments for Millions of Mr. Cooper Customers* (Nov. 7, 2023) https://www.nytimes.com/2023/11/07/business/cyberattack-mr-cooper-mortgages.html (last visited Dec. 7, 2023).
[5] Mr. Cooper Group Inc., Form 8-K, (Nov. 2, 2023) https://d18rn0p25nwr6d.cloudfront.net/CIK-0000933136/51b7c580-cebd-4fa6-8d5b-f22bb7da7c5f.pdf (last visited Dec. 7, 2023).
[6] Mr. Cooper Group Inc., Form 8-K/A, *supra* n.1.
[7] Notice of Security Incident, *supra* n.3.

monitoring services. To date, Mr. Cooper has not sent such followed up notices nor provided credit monitoring services.

28.     Mr. Cooper is responsible for allowing the Data Breach to occur because it failed to implement and maintain reasonable safeguards, failed to comply with industry-standard data security practices, as well as federal and state laws and regulations governing data security, and failed to supervise, monitor, and oversee all third parties it hired who had access to Plaintiff's and the Class members' PII.

29.     During the Data Breach, Mr. Cooper failed to adequately monitor its information technology infrastructure. Had Mr. Cooper done so, it would have prevented or mitigated the scope and impact of the Data Breach.

30.     Plaintiff's and Class members' PII was provided to Mr. Cooper with the reasonable expectation and understanding that Mr. Cooper would comply with its obligations to keep such information confidential and secure from unauthorized access.

31.     Mr. Cooper's data security obligations were particularly important given the substantial increase in cyber and ransomware attacks and data breaches in the financial services industries preceding the date of the Data Breach, as well as given the incredibly sensitive nature of PII that it retained in its servers.

32.     By obtaining, collecting, and using Plaintiff's and Class members' PII, Mr. Cooper assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' PII from disclosure.

33.     As a result of Mr. Cooper's failure to protect sensitive PII it was entrusted with, Plaintiff and Class members are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. Plaintiff and Class members have also lost the

inherent value of their PII.

### Mr. Cooper Was on Notice of Data Breach Threats and the Inadequacy of Its Data Security

34.     Mr. Cooper's data security obligations were especially important given the substantial increase in cyberattacks and data breaches in recent years. In 2022, there were 1,802 reported data breaches, affecting approximately 422 million individuals.[8]

35.     Mr. Cooper should have been aware—and was aware—that it was at risk of an internal data breach that could expose the PII that it collected and maintained.

36.     Despite this, Mr. Cooper failed to take the necessary precautions required to safeguard Plaintiff's and Class members' PII from unauthorized access.

### Mr. Cooper Failed to Comply with Statutory and Regulatory Obligations

37.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[9]

38.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which establishes guidelines for fundamental data security principles and practices for business.[10] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand

---

[8] *2022 Data Breach Report*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf, at 2 (last visited Oct. 11, 2023).

[9] *See Start With Security: A Guide for Business*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205- startwithsecurity.pdf (last visited Dec. 8. 2023).

[10] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Oct. 17, 2023).

their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[11]

39.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[12]

40.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[13]

41.     Mr. Cooper also failed to comply with commonly accepted industry standards for data security. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

- Maintaining a secure firewall configuration;

---

[11] *Id.*

[12] *See Start With Security: A for Business*, FTC, *supra* n.9.

[13] *See Privacy and Security Enforcement Press Releases*, FTC, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Oct. 11, 2023).

- Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

- Monitoring for suspicious or irregular traffic to servers;

- Monitoring for suspicious credentials used to access servers;

- Monitoring for suspicious or irregular activity by known users;

- Monitoring for suspicious or unknown users;

- Monitoring for suspicious or irregular server requests;

- Monitoring for server requests for PII;

- Monitoring for server requests from VPNs; and

- Monitoring for server requests from Tor exit nodes.

42.     Mr. Cooper is also required by various states' laws and regulations to protect Plaintiff's and Class members' PII and to handle any breach of the same in accordance with applicable breach notification statutes.

43.     In addition to its obligations under federal and state laws, Mr. Cooper owed a duty to Plaintiff and Class members whose PII were entrusted to Mr. Cooper to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Mr. Cooper owed a duty to Plaintiff and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its systems and networks adequately protected the PII of Plaintiff and Class members.

44.     Mr. Cooper owed a duty to Plaintiff and Class members whose PII was entrusted to Mr. Cooper to design, maintain, and test its systems to ensure that the PII in Mr. Cooper's possession was adequately secured and protected.

10

45.     Mr. Cooper owed a duty to Plaintiff and Class members whose PII was entrusted to Mr. Cooper to create and implement reasonable data security practices and procedures to protect the PII in its possession.

46.     Mr. Cooper owed a duty to Plaintiff and Class members whose PII was entrusted to Mr. Cooper to implement processes that would detect a breach on its data security systems in a timely manner.

47.     Mr. Cooper owed a duty to Plaintiff and Class members whose PII was entrusted to Mr. Cooper to act upon data security warnings and alerts in a timely fashion.

48.     Mr. Cooper owed a duty to Plaintiff and class members whose PII was entrusted to Mr. Cooper to disclose if its systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII to Mr. Cooper.

49.     Mr. Cooper owed a duty to Plaintiff and Class members whose PII was entrusted to Mr. Cooper to disclose in a timely and accurate manner when data breaches occurred.

50.     Mr. Cooper owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequacy in its affirmative development of the systems to maintain PII and in its affirmative maintenance of those systems.

51.     In this case, Mr. Cooper was fully aware of its obligation to use reasonable measures to protect the PII of its customers. Mr. Cooper also knew it was a target for hackers. But despite understanding the consequences of inadequate data security, Mr. Cooper failed to comply with industry-standard data security requirements.

*The Effect of the Data Breach on Impacted Consumers*

52.     The exponential cost to Plaintiff and Class members resulting from the Data Breach

cannot be overstated. Criminals can use victims' PII to open new financial accounts, incur charges

in credit, obtain governmental benefits and identifications, fabricate identities, and file fraudulent tax

returns well before a person whose PII was stolen becomes aware of it.[14] Any one of these instances

of identity theft can have devastating consequences for the victim, causing years of often irreversible

damage to their credit scores, financial stability, and personal security.

53.     Mr. Cooper was or should have been aware that it was collecting highly valuable data,

which has increasingly been the target of data breaches in recent years.

54.     The link between a data breach and the risk of identity theft is simple and well

established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data

by selling the stolen information on the black market to other criminals who then utilize the

information to commit a variety of identity theft related crimes discussed below.

55.     The exposure of any PII can cause unexpected harms one would not ordinarily

associate with the type of information stolen. Cybercriminals routinely aggregate Private Information

from multiple illicit sources and use stolen information to gather even more information through

social engineering, credential stuffing, and other methods. The resulting complete dossiers of PII are

particularly prized among cybercriminals because they expose the target to every manner of identity

theft and fraud.

---

[14] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 8, 2023); *see also* Melanie Lockert, *How do hackers use your information for identity theft?*, CREDITKARMA (Oct. 1, 2021), https://www.creditkarma.com/id-theft/i/how-hackers-use-your-information (last visited Dec. 8, 2023); *see also* Ravi Sen, *Here's how much your personal information is worth to cybercriminals – and what they do with it*, PBS (May 14, 2021), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it (Dec. 8, 2023); *see also* Alison Grace Johansen, *4 Lasting Effects of Identity Theft*, LIFELOCK BY NORTON (Feb. 4, 2021), https://lifelock.norton.com/learn/identity-theft-resources/lasting-effects-ofidentity-theft (last visited Dec. 8, 2023).

56.     Identity thieves can use PII such as that exposed in the Data Breach to: (a) apply for credit cards or loans (b) purchase prescription drugs or other medical services (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits or insurance benefits; (f) file a fraudulent tax return using the victim's information; (g) commit espionage; or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

*Diminution of Value of PII*

57.     PII is valuable property.[15] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that PII has considerable market value.

58.     The PII stolen in the Data Breach is significantly more valuable than the loss of credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements.

59.     This type of data commands a much higher price on the dark web. As Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information … [is] worth more than 10x on the black market."[16]

60.     Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[17]

---

[15] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/new.items/d07737.pdf , at 2 (last visited Dec. 8, 2023).
[16] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Dec. 8, 2023).
[17] *See, e.g.,* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009)

61.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[18] Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[19]

62.     As a result of the Data Breach, Plaintiff's and Class members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

63.     The fraudulent activity resulting from the Data Breach may not come to light for years.

64.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

65.     Mr. Cooper was, or should have been, fully aware of the unique type and the significant volume of data on Mr. Cooper's network, amounting to millions of individuals' detailed PII and thus the significant number of individuals who would be harmed by the exposure of the unencrypted data.

66.     The injuries to Plaintiff and Class members were directly and proximately caused by

---

("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[18] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 8, 2023).
[19] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PCMAG (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited Dec. 8, 2023).

Mr. Cooper's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class members.

*Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

67.    As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

68.    Class members have spent, and will spend, time on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach upon seeing news reports, and monitoring their credit reports and financial accounts for suspicious activity, as Mr. Cooper advised in its online notice.[20]

69.    These mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches, in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[21]

70.    Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

---

[20] *See* Notice of Security Incident, *supra* n.3.
[21] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, *supra* n.14.

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

71.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

72.     Mr. Cooper was, or should have been, fully aware of the unique type and the significant volume of data on Mr. Cooper's network, amounting to millions of individuals' detailed PII and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

73.     The injuries to Plaintiff and Class members were directly and proximately caused by Mr. Cooper's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class members.

### Impact of Identity Theft Can Have Ripple Effects

74.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, in addition to the irreparable damage that may result from the theft of a Social Security number, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.

75.     And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they

---

[22] *See Identity Theft.gov*, FTC, https://www.identitytheft.gov/Steps (last visited Oct. 12, 2023).

experienced affected their ability to get credit cards and obtain loans such as student loans or mortgages.[23] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

76.     It is no wonder then that identity theft exacts a severe emotional toll on its victims.

77.     The 2017 Identity Theft Resource Center survey[24] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;

- 67% reported anxiety;

- 66% reported feelings of fear for the financial safety of family members;

- 24% reported fear for their physical safety;

- 15.2% reported that a relationship ended or was severely and negatively impacted by the identity theft; and

- 7% reported feeling suicidal.

78.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate and/or lack of focus;

- 28.7% reported that they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses, including aches and pains, heart palpitations,

---

[23] *Identity Theft: The Aftermath 2017*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited Oct. 12, 2023).
[24] *Id.*

sweating, and/or stomach issues;

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[25]

79.     There may also be a significant time lag between when PII is stolen and when it is actually misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

80.     As the result of the Data Breach, Plaintiff and class members have suffered and/or will suffer or continue to suffer economic loss, a substantial risk of future identity theft, and other actual harm for which they are entitled to damages, including, but not limited to, the following:

- Losing the inherent value of their PII;

- Losing the value of Mr. Cooper's implicit promises of adequate data security;

- Identity theft and fraud resulting from the theft of their PII;

- Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

- Costs associated with purchasing credit monitoring and identity theft protection services;

- Unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in

---

[25] *Id.*

[26] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, *supra* n.14.

the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

- Lowered credit scores resulting from credit inquiries following fraudulent activities;

- Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and

- The continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

81.     Additionally, Plaintiff and Class members place significant value in data security.

82.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Mr. Cooper would have no reason to tout their data security efforts to their actual and potential customers.

83.     Consequently, had consumers or noteholders known the truth about Mr. Cooper's data security practices—that Mr. Cooper would not adequately protect and store their data—the consumers' PII would not have entrusted to Mr. Cooper, or consumers would have purchased insurance to protect them from losses associated with Mr. Cooper's.

84.     As such, Plaintiff and Class members did not receive the benefits and protection for to which they were entitled when their PII was entrusted to Mr. Cooper as their mortgage servicer with the reasonable expectation that Mr. Cooper would adequately protect and store their data, which it did not.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

86.     Plaintiff brings this action on behalf of himself and the members of the proposed Class, which consists of:

> All individuals residing in the United States whose personal identifiable information was compromised as a result of the Data Breach.

87.     Excluded from the Class are Defendants, any entity in which Defendants has a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

88.     Plaintiff reserves the right to amend the above definition or to propose subclasses before the Court determines whether certification is appropriate.

89.     **Numerosity**: The proposed Class is so numerous that joinder of all members is impracticable. Mr. Cooper services over 4 million mortgages meaning the total number of individuals affected in the Data Breach may be in the million.

90.     **Typicality**: Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Mr. Cooper's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive PII

20

compromised in the same way by the same conduct of Mr. Cooper.

91.     **Adequacy**: Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained competent counsel who are experienced in prosecuting complex class action and data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

92.     **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. The injury suffered by each individual member of the Class is relatively small in comparison to the burden and expense of individual prosecution of litigation. It would be very difficult for members of the Class to effectively redress Mr. Cooper's wrongdoing. Further, individualized litigation presents a potential for inconsistent or contradictory judgments.

93.     **Commonality and Predominance**: There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.

94.     Among the questions of law and fact common to the Class are:

a.  Whether Mr. Cooper engaged in the wrongful conduct alleged herein;

b.  Whether Mr. Cooper failed to adequately safeguard Plaintiff's and the Class's PII;

c.  Whether Mr. Cooper negligently hired and/or failed to supervise the third-party vendor it hired and gave access to Plaintiff's and the Class's PII;

d.  Whether Mr. Cooper owed a duty to Plaintiff and the Class to adequately protect their PII, and whether it breached this duty;

e.   Whether Mr. Cooper breached its duties to Plaintiff and the Class as a result of the Data Breach;

f.   Whether Mr. Cooper's conduct, including its failure to act, resulted in or was the proximate cause of the breach;

g.   Whether Mr. Cooper was negligent in permitting the third-party access to Plaintiff's and the Class's PII;

h.   Whether Mr. Cooper was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

i.   Whether Mr. Cooper failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

j.   Whether Mr. Cooper continues to breach duties to Plaintiff and the Class;

k.   Whether Plaintiff and the Class suffered injury as a proximate result of Mr. Cooper's negligent actions or failures to act;

l.   Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

m.   Whether Mr. Cooper's actions alleged herein constitute gross negligence, and whether Plaintiff and Class members are entitled to punitive damages.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(By Plaintiff and on Behalf of the Class)**

95.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

96.     Defendants owed a duty of care to Plaintiff and Class members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems, as alleged herein. These common law duties existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices in Defendants' affirmative development and maintenance of its data security systems and its hiring of third-party providers entrusted with accessing, storing, safeguarding, handling, collecting, and/or protecting Plaintiff's and Class members' PII. In fact, not only was it foreseeable that Defendants and Class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendants also knew that it was more likely than not that Plaintiff and other Class members would be harmed by such exposure and theft of their PII.

97.     Defendants' duties to use reasonable security measures also arose as a result of a special relationship with Plaintiff and Class members as a result of being entrusted with their PII, which provided an independent duty of care. Plaintiff's and Class members' PII was entrusted to Defendants predicated on the understanding that Defendants would take adequate security precautions. Moreover, Defendants were capable of protecting its network and systems, and the PII it stored on them, from unauthorized access.

98.     Defendants' duties to use reasonable data security measures also arose under Section

5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendants' duties.

99.     Defendants breached the aforementioned duties when it failed to use security practices that would protect the PII provided to it by Plaintiff and Class members, thus resulting in unauthorized exposure and access to Plaintiff's and Class members' PII.

100.     Defendants further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff's and Class members' PII within its possession, custody, and control.

101.     As a direct and proximate cause of Defendants' failure to use appropriate security practices and failure to select a third-party provider with adequate data security measures, Mr. Plaintiff's and Class members' PII was exposed, disseminated, and made available to unauthorized third parties.

102.     Defendants admitted that Plaintiff's and Class members' PII was wrongfully disclosed as a result of the Data Breach.

103.     The Data Breach caused direct and substantial damages to Plaintiff and Class members, as well as the likelihood of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud and identity theft.

104.     By engaging in the foregoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendants' conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately

limit access to and protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class members' PII.

105.     But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and Class members, their PII would not have been compromised.

106.     Neither Plaintiff nor Class members contributed to the Data Breach or subsequent misuse of their PII as described in this Complaint.

107.     As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendants, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
#### (By Plaintiff and on Behalf of the Class)

108.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

109.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting

commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendants' duty.

110.    Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach.

111.    Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

112.    Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

113.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of Defendants failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class members.

114.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft

insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendants, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### (By Plaintiff and on Behalf of the Class)

115.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

116.    Plaintiff and Class members entered into an implied contract with Defendants when they obtained products or services from Defendants, or otherwise provided PII to Defendants.

117.    As part of these transactions, Defendants agreed to safeguard and protect the PII of Plaintiff and Class members and to timely and accurately notify them if their PII was breached or compromised.

118.    Plaintiff and Class members entered into the implied contracts with the reasonable expectation that Defendants' data security practices and policies were reasonable and consistent with legal requirements and industry standards. Plaintiff and Class members believed that Defendants would use part of the monies retained by Defendants from their mortgage payments or the monies obtained from the benefits derived from the PII they provided to fund proper and reasonable data security practices.

119.    Plaintiff and Class members would not have provided and entrusted their PII to Defendants in the absence of the implied contract or implied terms between them and Defendants. The safeguarding of the PII of Plaintiff and Class members was critical to realize the intent of the parties.

120.    Plaintiff and Class members fully performed their obligations under the implied

contracts with Defendants.

121.    Defendants breached their implied contracts with Plaintiff and Class members to protect their PII when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties.

122.    As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(In the alternative)**
**(By Plaintiff and on Behalf of the Class)**

123.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

124.    This claim is pleaded in the alternative to the Breach of Implied contract claim set forth in the Third Cause of Action.

125.    Plaintiff and Class members have an interest, both equitable and legal, in the PII

about them that was conferred upon, collected by, and maintained by Defendants and that was ultimately stolen in the Data Breach.

126.    Defendants benefitted from the conferral upon it of the PII pertaining to Plaintiff and Class members and by its ability to retain, use, sell, and profit from that information. Defendants understood that it was in fact so benefitted.

127.    Defendants also understood and appreciated that the PII pertaining to Plaintiff and Class members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that PII.

128.    But for Defendants' willingness and commitment to maintain its privacy and confidentiality, Plaintiff and Class members nor any noteholder would not have provided Plaintiff and Class members' PII to Defendants or would not have permitted Defendants to gather additional PII.

129.    Plaintiff's and Class members' PII has an independent value to Defendants.

130.    Mr. Cooper admits that it uses the PII it collects for, among other things, providing consumers "opportunities to buy products" offered by itself or other financial institutions; sharing with other companies with which it has a joint marketing agreement; and tracking consumers online activity across third-party websites and online services for the purpose of targeted advertising.[27]

131.    Because of its use of Plaintiff's and Class members' PII, Defendants sold more services and products than it otherwise would have. Mr. Cooper was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create through the use of Plaintiff's and Class members' PII to the detriment of Plaintiff and Class members.

132.    Defendants also benefitted through its unjust conduct by retaining money paid by Plaintiff and Class members that it should have used to provide proper data security to protect Plaintiff's and Class members' PII.

133.    It is inequitable for Defendants to retain these benefits.

---

[27] Privacy Policy, Mr. Cooper, *supra* n.2.

134.    As a result of Defendants' wrongful conduct as alleged in this Complaint (including among other things its failure to employ proper data security measures, its continued maintenance and use of the PII belonging to Plaintiff and Class members without having proper data security measures, and its other conduct facilitating the theft of that PII), Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members.

135.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

136.    It is inequitable, unfair, and unjust for Defendants to retain these wrongfully obtained benefits. Defendants' retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

137.    The benefit conferred upon, received, and enjoyed by Defendants was not conferred officiously or gratuitously, and it would be inequitable, unfair, and unjust for Defendants to retain the benefit.

138.    Defendants' defective security and its unfair and deceptive conduct have, among other things, caused Plaintiff and Class members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their PII and has caused the Plaintiff and Class members other damages as described herein.

139.    Plaintiff has no adequate remedy at law.

140.    Defendants is therefore liable to Plaintiff and Class members for restitution or disgorgement in the amount of the benefit conferred on Defendants as a result of its wrongful conduct, including specifically: the value to Defendants of the PII that was stolen in the Data Breach; the profits Defendants received and is receiving from the use of that information; the amounts that Defendants overcharged Plaintiff and Class members for use of Defendants' products and services; and the amounts that Defendants should have spent to provide proper data security to protect

Plaintiff' sand Class members' PII.

## FIFTH CAUSE OF ACTION
## BREACH OF CONFIDENCE
### (By Plaintiff and on Behalf of the Class)

141.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

142.     Plaintiff and Class members maintained a confidential relationship Defendants whereby Defendants undertook a duty not to disclose to unauthorized parties the PII that Plaintiff and Class members provide to Defendants. Such PII was confidential and novel, highly personal and sensitive, and not generally known.

143.     Defendants knew Plaintiff's and Class members' PII was disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the PII it collected, stored, and maintained.

144.     As a result of the Data Breach, there was an unauthorized disclosure of Plaintiff's and Class members' PII in violation of this understanding. The unauthorized disclosure occurred because Defendants failed to implement and maintain reasonable safeguards to protect the PII in its possession and failed to comply with industry-standard data security practices.

145.     Plaintiff and Class members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

146.     But for Defendants' actions and inactions in violation of the parties' understanding of confidence, the PII of Plaintiff and Class members would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendants' actions and inaction were the direct and legal cause of the theft of Plaintiff's and Class members' PII, as well as the resulting damages.

147.     The injury and harm Plaintiff and Class members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiff's and Class members' PII.

Defendants knew their computer systems and technologies for accepting, securing, and storing Plaintiff's and Class members' PII had serious security vulnerabilities because Defendants failed to observe even basic information security practices or correct known security vulnerabilities.

148.   As a direct and proximate result of Defendants' breach of confidence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

149.   By collecting and storing this PII and using it for commercial gain, Defendants have a duty of care to use reasonable means to secure and safeguard this PII to prevent disclosure and guard against theft of the PII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

  a.   An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the Class requested

herein;

b.   For injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Class as requested herein;

c.   For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

d.   For an award of restitution or disgorgement, in an amount to be determined;

e.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.   For prejudgment interest on all amounts awarded; and

g.   Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED:  December 11, 2023                    Respectfully submitted,

/s/  Ellen A. Presby
Ellen A. Presby
State Bar No. 16249600
**FERRER POIROT FELLER DANIEL**
2603 Oak Lawn Avenue, Suite 300
Dallas, Texas 75219
Phone: (214) 521-4412
epresby@lawyerworks.com

Sabita J. Soneji (*pro hac vice forthcoming*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Phone: (510) 254-6808
ssoneji@tzlegal.com

F. Peter Silva, II (*pro hac vice forthcoming*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, D.C. 20006
Phone: (202) 973-0900
psilva@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*